# EXHIBIT 2

Page 1

1              UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF FLORIDA

3                   Civil Action No. 14-14360

4

5        TRAVELERS PROPERTY CASUALTY
         COMPANY OF AMERICA,

6

                        Plaintiff,

7        vs.

8        SUNCOAST SHIPPING, LLC.,

9                        Defendant.
         _____/

10

11

12

                        Duane Morris, LLP

13                      5100 Town Center Circle,
                        Boca Center Tower II, Suite 650

14                      Boca Raton, Florida 33486
                        Thursday, January 8, 2015

15                      12:28 p.m. - 2:53 p.m.

16

17

18              DEPOSITION OF JEAN ROUZIER

19

20        Taken before MARIA E. REEDER, RPR, FPR

21        and Notary Public for the State of Florida at

22        Large, pursuant to Notice of Taking Deposition

23        filed in the above cause.

24

25     Job No. NJ1991074

Page 2

```
 1   APPEARANCES:
 2
     On behalf of Plaintiff:
 3
     DUANE MORRIS, LLP
 4   One Riverside Plaza
     Newark, NJ 07102
 5   BY: JAMES CARBIN, ESQ.
     jwcarbin@duanemorris.com
 6
 7
     On behalf of Defendant:
 8
     LARRY S. SAZANT, P.A.
 9   1920 E. Hallandale Beach Boulevard, Suite 510
     Hallandale, FL 33009
10   BY: LARRY S. SAZANT, ESQ.
     lss@bellsouth.net
11
12   REPORTED BY:
13   MARIA E. REEDER, RPR, FPR
     Veritext Florida Reporting
14   2 South Biscayne Boulevard, Suite 2250
     Miami, FL 33131
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          I N D E X
 2   Jean Rouzier
 3
     EXAMINATION                    PAGE
 4
 5   Direct by Mr. Carbin          04
 6   Cross by Mr. Sazant           80
 7
 8          E X H I B I T S
 9   PLAINTIFF'S FOR IDENTIFICATION    PAGE
10   Exhibit 1   Notice of Deposition       07
     Exhibit 2   Business Card              04
11   Exhibit 3   12/12/14 Letter           08
     Exhibit 4   Plaintiff's Initial Disclosure  08
12   Exhibit 5   Plaintiff's Notice Compliance   08
     Exhibit 6   E-mails                   10
13   Exhibit 7   E-mails                   24
     Exhibit 8   Brave Cargo Shipping          27
14   Exhibit 9   Meyerrose & Company, Inc.   35
     Exhibit 10  Exhibit 1                 40
15   Exhibit 11  Complaint for Declaratory    41
     Exhibit 12  Frenkel & Company Invoice    49
16   Exhibit 13  E-mails                   51
     Exhibit 14  6/21/13 letter            64
17   Exhibit 15  Travelers Declaration     64
     Exhibit 16  Manila Folders            74
18   Exhibit 17  Document                  78
19
20
21
22
23
24
25
```

Page 4

```
 1        Thereupon:
 2            JEAN ROUZIER,
 3        A witness named in the notice heretofore filed,
 4   being of lawful age and having been first duly
 5   sworn, testified on his oath as follows:
 6        THE WITNESS:  I tell you the truth and
 7   nothing but the truth.
 8            DIRECT EXAMINATION
 9   BY MR. CARBIN:
10   Q   Good morning.
11   A   Good morning, sir.
12   Q   I should say good afternoon.
13   A   Yeah, right.
14   Q   Thank you.
15        The witness handed me a business card,
16   Suncoast Shipping, LLC.  I'm going to put on the
17   back of this, exhibit sticker Rouzier 2.
18        (Rouzier Exhibit 2 marked for
19   identification.)
20   Q   (By Mr. Carbin) Thank you for that.
21   A   Welcome.
22   Q   What is your full name, please?
23   A   I think it's there, but it's Jean Rouzier,
24   R-O-U-Z-I-E-R.
25   Q   And your home address, sir?
```

Page 5

```
 1   A   5475 Northwest St. James Drive, Port St.
 2   Lucie, Florida 34983.
 3   Q   Mr. Rouzier, my name is James Carbin.  We
 4   met on the record.  I'm the attorney for Travelers
 5   Property Casualty Company of America.  I'm going to
 6   be asking you some questions today.
 7        If any question I ask you isn't clear,
 8   please tell me and I'll do my best to improve the
 9   question or ask you one that's clearer.  How is
10   that?
11   A   Understood.
12   Q   If you do answer a question, we're going
13   to rely upon the answer that you give us.  Do you
14   understand that?
15   A   Very well.
16   Q   Will you point out to me any difficulty
17   you have with the question so that we can get a
18   clear record.
19   A   No, I have no problem.  You can ask the
20   question.
21   Q   One thing I'll mention is that -- so that
22   the court reporter can get everything down -- please
23   let me finish my question before you speak, and I'll
24   let you finish your answer before I follow up.
25   Okay?
```

Veritext Legal Solutions

Page 6

```
1    A   Very well.
2    Q   Do you have any questions before we start?
3    A   No.  You're supposed to ask me.
4    Q   Let's talk about some background first.
5    A   Yeah.
6    Q   You handed me a business card from
7  Suncoast Shipping, LLC --
8    A   Yes.
9    Q   -- showing you as president, that we
10 marked as Rouzier Exhibit 2.
11       How long have you been president of
12 Suncoast Shipping, LLC?
13   A   Suncoast Shipping, about four years.
14   Q   Do you have any ownership interest in
15 Suncoast?
16   A   I am the president of Suncoast Shipping
17 and I am only owner of Suncoast Shipping, nobody
18 else.
19   Q   Where is Suncoast Shipping's offices
20 presently?
21   A   Presently it's 5475 Northwest St. James
22 Drive, Port St. Lucie, Florida, because we closed
23 the other office in Fort Pierce.
24   Q   When did you close that?
25   A   About a year ago.
```

Page 7

```
1    Q   Let me show you what we have marked as
2  Rouzier Exhibit 1.
3        Do you recognize this as a subpoena that
4  you're appearing here pursuant to?
5        (Rouzier Exhibit 1 marked for
6        identification.)
7    Q   (By Mr. Carbin) Do you recognize this?
8    A   I'm going to compare that to what I
9  received.
10       THE WITNESS:  Is this what you have?
11       MR. SAZANT:  Well, this is what we went
12       through.  Yeah, it's okay.  It's fine.
13   Q   (By Mr. Carbin) Just so we have a clear
14 record; is exhibit -- strike that.
15       Are you appearing here today pursuant to
16 the subpoena, Exhibit 1?
17   A   I'm appearing here for deposition.
18   Q   Correct, pursuant to the subpoena?
19   A   Right.
20   Q   You just pulled out a package of documents
21 from the briefcase you brought with you.
22   A   This is all you sent me by mail.
23   Q   May I see it, please?
24       Thank you.
25   A   Welcome.
```

Page 8

```
1    Q   I'm going to mark this packet of materials
2  that you just handed to me, and we'll mark these
3  things separately.
4        Rouzier 3 will be a letter from my office,
5  dated December 12, 2014, enclosing an order setting
6  pretrial schedule from the United States District
7  Court Southern District of Florida, dated December
8  5, 2014.
9        Rouzier Exhibit 4 will be a copy of
10 Plaintiff's initial disclosures in the Travelers
11 versus Suncoast matter signed and dated December 19,
12 2014.
13       Rouzier 5 will be a copy of Plaintiff's
14 Notice of Compliance in the Travelers/Suncoast
15 matter dated December 18, 2014.
16       (Rouzier Exhibits 3, 4 and 5 marked for
17       identification.)
18       (Discussion was held off the record.)
19   Q   (By Mr. Carbin) What is the business of
20 Suncoast Shipping?
21   A   Suncoast Shipping takes care of vessel,
22 with management of vessel and ship cargo.
23   Q   When you say "ship cargo," what do you
24 mean by that?
25   A   Okay.  We -- shipping cargo means that we
```

Page 9

```
1  receive the cargo and we ship it through whatever
2  place it's going.
3    Q   Are you familiar with the term "carrier"
4  -- "cargo carrier"?
5    A   No, it is not a cargo carrier.
6    Q   I'm sorry?
7    A   Suncoast is not a cargo carrier.  Suncoast
8  does not own any equipment.  Suncoast manage the
9  cargo carrier.  If you have a vessel and you want to
10 ship cargo, Suncoast can take care of that for you.
11 Find -- first she can actually help you find the
12 cargo, or if you have the cargo, she can help you
13 ship the cargo to the destination.
14   Q   When you say "Suncoast does not own any
15 equipment," what do you mean by that?
16   A   No, it doesn't own any boat or any vessel.
17   Q   Does Suncoast own the Tug Billy G?
18   A   No.
19   Q   Has Suncoast ever owned the Tug Billy G?
20   A   Never.
21   Q   Who is the owner of the Tug Billy G?
22   A   Faskha Shipping.  Saul Faskha.
23   Q   Can you spell that for us?
24   A   F-A-S-H -- no -- K-A.  F-A-S-K-H-A
25 Shipping.
```

Page 10

```
1        (Rouzier Exhibit 6 marked for
2    identification.)
3    Q    (By Mr. Carbin) Let me show you what we
4  have marked as Rouzier Exhibit 6, and this appears
5  to be a string of e-mails.
6        The top e-mail seems to be from yourself
7  to a Mr. Smieya. S-M-I-E-Y-A.
8        Do you see that?
9    A    This one you're talking about.
10 Mr. Smieya, Mark Smieya, yes.
11   Q    And is this a copy of an e-mail that you
12 forwarded to Mr. Smieya?
13   A    Yes.
14   Q    And in -- is that Exhibit 6, the number on
15 the bottom?
16   A    Yes, Number 6.
17   Q    There's an e-mail dated January 23, 2014
18 from you to a Gregory Ward.  Do you see that?
19   A    What part are you referring to?
20        Gregory Ward, yes.
21   Q    And in the context of your e-mail to
22 Mr. Ward, you say that "The owners of the tug are
23 (Faskha) F-A-S-K-H-A Shipping in Panama."
24   A    In Panama.  That's right.
25   Q    Was Faskha Shipping in Panama the owner of
```

Page 11

```
1  the Tug Billy G throughout the events that we're
2  going to be talking about, the trip to Haiti and the
3  diversion to Cuba?
4    A    As far as I'm concerned, on day one, when
5  I met Mr. Faskha, until the end, he was the owner of
6  the tug.
7    Q    And as far as you know, he's still the
8  owner of the tug?
9    A    Supposedly, yes.
10   Q    And he has been the owner, or his company
11 has been the owner throughout?
12   A    All the time.  All the time.
13   Q    What is the relationship between Suncoast
14 Shipping and Faskha Shipping.
15   A    Okay.  Let me begin to tell you how I met
16 Mr. Faskha.
17        I met him through a company called Ortega
18 Marina, which is Rudy Ortega.
19   Q    What?
20   A    Ortega Marine.
21   Q    Can you spell that, please?
22   A    Ortega Marine.  O-R-T-E-G-A.  Ortega
23 Marine.  Rudy Ortega.  And Rudy happens to be one of
24 the employee that Suncoast shipping had.  He was the
25 GPA responsible for cleaning the vessel in and out,
```

Page 12

```
1  and through him and through Mr. Saul Faskha.
2        Mr. Saul Faskha at that time had that tug,
3  Billy G, stranded in the Bahamas in an island.
4    Q    Not to interrupt you, but as you speak,
5  can you -- when you say "at that time," can you give
6  me some dates or months or year?
7    A    It's about mid-2012.  He had that tug
8  stranded in an island in the Bahamas, the island
9  called -- I'm trying to remember the name of this
10 island.  I forget the name.
11        Anyway, he told me that he bought that
12 tug.  He never could have work for the tug.  If I
13 could help him find work for the tug.  This is when
14 we met.  I told him I would have to inspect the tug
15 first.  I went to the island, I inspect the tug and
16 I carry the tug over to Fort Pierce for him.
17   Q    When you say "you inspected the tug" --
18   A    I see the tug was in condition of working.
19   Q    Let me finish the question.
20        When you say "you inspected the tug," did
21 you personally inspect the tug?
22   A    Oh, yes, I did.
23   Q    Did you do any report of your inspection
24 of the tug?
25   A    Not right away because my instruction was,
```

Page 13

```
1  after inspection of the tug, can you carry the tug
2  over to the U.S.  So I -- the crew was on board, I
3  spoke to the captain and I told him that from order
4  from Mr. Faskha, the tug will have to go back to the
5  U.S., so the tug went back to U.S., to Fort Pierce.
6    Q    When you say "back to the U.S."?
7    A    Because she was in U.S. first.
8    Q    When did it leave the U.S.?
9    A    I don't know.  Prior to that, I don't
10 know.  I only knew that -- from that point on, this
11 is what I know.  I don't know how long he was
12 before, you know, in the U.S.  I didn't know about
13 that.
14   Q    So your first involvement with the Tug
15 Billy G was when you were contacted by Mr. Faskha
16 and the tug was in the Bahamas?
17   A    That's correct.
18   Q    And he was asking you to see if you could
19 help him find work for the tug?
20   A    Right.
21   Q    Do you know how long Mr. Faskha had owned
22 the tug up until that point?
23   A    It was not long, according to what I
24 heard.  It was probably less than a year.
25   Q    So after you did an inspection of the
```

4 (Pages 10 - 13)

1 tug -- by the way, did you take any photographs or
2 anything of the tug?
3     A    You know, my first inspection was visual.
4 It means nothing until you have surveyor come.  So
5 we brought the tug back to the U.S., the surveyor
6 from Panama came because the tug had Panama flag.
7 Okay.
8          So we brought the surveyor from Panama and
9 the surveyor issue the list of recommendation before
10 he can issue all final certificates.  There were 16
11 certificates, including the loadline.
12          Now, in order to get the loadline, the tug
13 had to go to dry dock.  So I present to Mr. Faskha
14 the list of what the tug need to do before she can
15 have all the document legal again.
16          I give him a budget, $15,000.  We went to
17 the yard in the U.S., at Colonna's, C-O-L-O-N-N-A,
18 Shipyard in Norfolk, Virginia.
19     Q    Let's back up for a minute.  You said
20 something about $18,000?
21     A    No, no.  I give him what they call a
22 budget, you know; otherwise, I give him an estimate
23 of what the dry dock will cost him because I had
24 spoken to Colonna's and they had given an estimate
25 of $15,000, that was including in and out.

1          That's lift the tug, put it on dry dock,
2 make what they call impression.  First of all, an
3 inspection, and audio gauge, which is the
4 measurement of the thickness of the steel, to see if
5 it was still very good.  It measures the shaft
6 clearance, the rudder clearance and put all the zinc
7 that was missing back, clean the sea chest, which is
8 the intake of the water to cool down the engine.
9 That's what it is.  Okay.
10          And then give the vessel pressure
11 cleaning, pressure clean the hull and apply two
12 coats, one coat of anticorrosive and one coat of --
13 one coat of anticorrosive and one coat of
14 antifouling, so the whole thing came up to $14,000.
15 It was just right.
16     Q    14,000?
17     A    14,000.  We paid --
18     Q    So the original quote was 15,000?
19     A    15 and we came out to less.
20     Q    And you gave a budget of 18?
21     A    No, 15.
22     Q    One-five?
23     A    One-five.  Whatever the shipyard give me.
24     Q    When was the Tug Billy G dry docked?
25     A    It was dry docked probably one month after

1 I remove it from that island, you know.
2     Q    When was that?
3     A    The date, I have all the information
4 because I have the Colonna's lease and everything.
5 It was probably almost end of 2012, beginning of
6 2013.  I have all the date in my --
7     Q    Was the Tug Billy G insured through that
8 period?
9     A    No, no, not yet.  Not yet.  No, not yet.
10     Q    When was there first an effort to obtain
11 insurance for the tug?
12     A    After the dry docking.  The surveyor was
13 there during the dry docking issue --
14     Q    I don't mean to interrupt you, but so I
15 don't have to come back to it.  Who was the
16 surveyor?  The Panamanians?
17     A    Panamanian surveyor.
18     Q    Do you have a copy of his survey?
19     A    Yes, we do, but not with me.  You didn't
20 ask me to bring that.  It was not part of the --
21     Q    So you have the original survey that the
22 Panamanian surveyor did?
23     A    Oh, yeah, everything.  We have copy of the
24 dry dock, we have everything.
25     Q    With the recommendations?

1     A    Everything that was asked by the surveyor
2 was done.
3     Q    Wait.  Let's stick with my question,
4 please.  It will go a lot quicker and you will get
5 out of here and we will all be done earlier.
6          Do you have a copy of the original survey
7 done by the Panamanian surveyor --
8     A    Of course.
9     Q    -- that came up with the list of
10 recommendations?
11     A    We have that.
12     Q    And I take it the Panamanian surveyor
13 attended at the dry docking?
14     A    Yes, he did.
15     Q    Did he attend at the end of the dry
16 docking or throughout the work?
17     A    He attended -- he did attend what we call
18 the audio gauge, which is the measurement of the
19 thickness of the steel.
20          And after that, he did merge the shaft
21 clearance and the rudder clearance.  He make sure
22 that the zinc was in place that was missing.  You
23 know what zinc anodes are, right?
24     Q    Did the Panamanian surveyor stay
25 throughout the dry docking, or did he come at the

1 beginning, or the end or --
2    A   He came at the beginning and the dry
3 docking lasted four days, so he probably stayed two
4 days.  And then when we start painting it, he went
5 back home.
6    Q   Did he issue a report after the dry
7 docking?
8    A   Of course he issue the report.  I have the
9 report.
10    Q   What is the name of this Panamanian
11 surveyor?
12    A   I don't remember the name, but I can dig
13 that out for you.  You know, it was not part of what
14 you asked me to bring.
15        I could not bring the whole file.  I have
16 everything.
17    Q   Where is the file?
18    A   I have it in my office.  You know, where I
19 keep my office right now, in my house.
20    Q   Oh, you keep your office in your house
21 now?
22    A   Yes.
23    Q   And what do you have all this on a --
24    A   I have everything, everything from day one
25 to the end.

1    Q   Let me finish.
2        MR. SAZANT:  Let him finish his question.
3    Q   (By Mr. Carbin) When you say you have
4 everything, do you have a paper copy or a computer
5 record or which?
6    A   Paper copy.
7    Q   What do you call that, the Billy G file or
8 something else?
9    A   Billy G, yes.
10    Q   All right.  So after the dry docking, were
11 you still looking for work for the tug?
12    A   Yes.  The tug -- at that point, the tug --
13 the surveyor issue all 16 many certificates that the
14 vessel needs to be able to enter U.S. waters, okay,
15 and work.
16        So the Coast Guard bought the vessel and
17 inspect the vessel and issue a report.  No
18 recommendation whatsoever.  Everything was perfect.
19    Q   Okay.  Am I correct that the tug had a
20 Panamanian registration?
21    A   Of course, and the Coast Guard does
22 inspect --
23    Q   Let me ask the question.  We will get
24 there.  All right.
25        And the tug had a Panamanian flag?

1    A   Yes.
2    Q   Am I correct that as a foreign
3 registration vessel, the tug couldn't operate
4 between U.S. ports.
5    A   Say that again.
6    Q   Surely.
7        Am I correct that as a foreign registered
8 vessel, the tug could only come to a U.S. port and
9 from a U.S. port --
10    A   That's Jones Act.
11    Q   But could not go trade between --
12    A   It --
13    Q   Let me finish.
14        MR. SAZANT:  Let him get through it.
15    Q   (By Mr. Carbin) But the tug could not
16 trade between U.S. ports.
17    A   It never trade between U.S. port.
18    Q   And am I correct that as a foreign flag
19 vessel it could not legally trade between U.S.
20 ports?
21    A   100 percent correct.
22    Q   So the work you were looking for for the
23 tug was basically outbound from the U.S.?
24    A   That's correct.
25    Q   Did you find work for the tug?

1    A   Yes.
2    Q   What work did you find?
3    A   Okay.  I had a signed contract for the tug
4 between Las Corridas, Mexico and Honduras to carry
5 salt, S-A-L-T, in bulk.  That contract was a signed
6 contract.  It took me about three months, you know,
7 because the moment I get to management, while I was
8 preparing the tug, I was looking for work.  Right.
9        So I found the work and we had a signed
10 contract for $140,000, a trip between these two
11 ports, back-to-back without stopping.
12    Q   So that's not U.S. work?
13    A   No, that's not U.S.  This is Las Corridas,
14 Mexico --
15    Q   Right.
16    A   -- to Honduras.  It has nothing to do with
17 U.S.
18    Q   Was that a spot move or a continuing --
19    A   Continue back-to-back.
20    Q   Let me finish the question.
21        Did the tug ever work under that contract?
22    A   No.
23    Q   What happened?
24    A   Okay.  In order for the tug to prepare for
25 that work, the barge need the crane on board to open

6 (Pages 18 - 21)

1 the hatch because the barge was an open barge,
2 was -- the hatch, you have to open this hatch.
3     This hatch weighs about three tons, okay,
4 even though they was fiberglass. So we had to
5 install a crane. We did install a crane on board.
6 It took us about, maybe three weeks. You know,
7 between purchasing the crane, the tug was sitting in
8 Fort Pierce. You know, the barge was there with the
9 tug, and we installed the crane on board the barge.
10   Q  What barge are you talking about?
11   A  FLAG 4000.
12   Q  Did you install a crane on a barge?
13   A  Yes.
14   Q  Where was that done?
15   A  That done in Fort Pierce, Florida at the
16 Fisherman's Dock.
17   Q  Where?
18   A  Fisherman's Dock.
19   Q  What kind of crane was that?
20   A  It was an 80-ton crane.
21   Q  And that was --
22   A  That was a crawler crane.
23   Q  A crawler crane?
24   A  Yes.
25   Q  How was that crane secured to the barge?

1   A  It was secured with a platform that was
2 bolted to the deck of the barge. And I have all the
3 writing on that. I can show to you any time.
4   Q  So after you put the crane on the barge,
5 did the Tug Billy G perform under the contract
6 between Honduras and Mexico?
7   A  No. The contract was -- start 30 days
8 after we finish the work. So in the meantime the
9 owner, Mr. Faskha came to see the crane, saw it and
10 everything. And sitting at the dock he was offered
11 the cargo to Haiti by a company called -- this
12 company. I forget the name of it. I got it right
13 there. Okay.
14     He was offered a cargo to Haiti, okay, and
15 he accepted the cargo. And he told me, Jean, we go
16 first to Haiti, we finish that load and we go
17 straight back to Honduras. We have enough time to
18 do it? I say, "Yes, we have enough time to do it."
19 Okay. The cargo for Haiti was a good paid cargo, it
20 was $80,000, and he accept it.
21   Q  What was the relationship between Suncoast
22 and Faskha --
23   A  It was --
24   Q  -- with respect to the job to Haiti?
25   A  It was the same with the ship, joint

1 venture.
2     (Rouzier Exhibit 7 marked for
3     identification.)
4   Q  (By Mr. Carbin) Let me show you what we
5 marked and Rouzier Exhibit 7.
6   A  All right.
7   Q  What is this?
8   A  No. This is the joint venture agreement
9 signed between Suncoast Shipping and the company who
10 had the cargo, Brave Cargo Shipping.
11   Q  Now, let's first look at the cover sheet
12 of Exhibit 7. Is this an e-mail that you sent to
13 Mr. Smieya?
14   A  Yes.
15   Q  At Travelers Insurance?
16   A  Yes, I did send that to him.
17   Q  And your purpose in sending that to
18 Mr. Smieya was, according to your e-mail, to show
19 the joint venture between Suncoast and Brave
20 Shipping, Brave Cargo Shipping?
21   A  Yes. You know why I did that?
22   Q  Why did you do that?
23   A  Because when Travelers went against
24 Suncoast Shipping trying to show that Suncoast
25 Shipping, you know, right, had lost control over the

1 barge and the tug, they accuse Suncoast shipping of
2 making the -- not a joint venture agreement.
3     Mr. Mike Smieya accuse Suncoast Shipping
4 in the letter where they was trying to dismiss, you
5 know, right, okay, the insurance, otherwise, you
6 know, we are not going to pay you. They say
7 Suncoast Shipping has lost control of the tug by the
8 fact that he made Bare Boat Charter.
9     When you make Bare Boat Charter, you lose
10 control of the vessel because your other party is
11 controlling the vessel. Under that insurance
12 policy, I had no right to do that.
13     It was not that. It was joint venture
14 agreement where Suncoast Shipping all the time kept
15 control over the barge and the tug. That is why I
16 sent him that letter to explain that he was wrong.
17   Q  Am I correct that Suncoast Shipping did
18 not have a charter for the Tug Billy G?
19   A  What do you mean, did not have a charter.
20   Q  Bad question. As I said, I'm pleased to
21 rephrase it.
22     Did Suncoast Shipping have a charter for
23 the Tug Billy G?
24   A  No, not with that company. We had -- no,
25 we had no charter whatsoever. What we had, it was

Page 26

1 the cargo agreement, the contract, to carry salt
2 from Las Corridas, Mexico to Honduras. That was --
3 never took effect. It was signed but we don't -- we
4 couldn't because it was in Cuba at the time.
5       But Suncoast Shipping never had a charter
6 agreement or Bare Boat charter like Mr. Smieya let
7 me understood [sic]. No, he was 100 percent wrong.
8 It was a joint venture agreement and that is the
9 proof of it.
10   Q   And you're showing me Exhibit 7.
11      Who is Brave Cargo Shipping?
12   A   Okay. Let me show you who Brave Cargo
13 Shipping.
14      Brave Cargo Shipping is a U.S.
15 corporation, was collecting cargo from the U.S. to
16 Haiti. Does that answer your question?
17   Q   What was the relationship -- strike that.
18      Did Brave Cargo Shipping and Suncoast
19 Shipping have any relationship --
20   A   None whatsoever.
21      MR. SAZANT: Let him finish.
22   A   Sorry.
23   Q   (By Mr. Carbin) Did Brave Cargo Shipping
24 and Suncoast Shipping have any relationship beyond
25 the joint venture agreement that we have as Exhibit

Page 27

1 7?
2   A   None whatsoever.
3   Q   Do you know who the owner of Brave Cargo
4 Shipping is?
5   A   A man called Rollins.
6   Q   Can you spell that?
7   A   R-O-L-L-I-N-S.
8   Q   Where do we find Brave Cargo Shipping? Do
9 we have an address?
10   A   I have something from Brave Cargo
11 Shipping. Let me find it for you.
12      This is letterhead from Brave Cargo
13 Shipping.
14      (Rouzier Exhibit 8 marked for
15      identification.)
16   Q   (By Mr. Carbin) The witness has handed me
17 a blank --
18   A   It says Brave Cargo --
19   Q   The witness has handed me a document on
20 the letterhead on the letterhead of Brave Cargo
21 Shipping with an address. It's a blank form for
22 receiving. We marked it as Rouzier 8.
23   Q   (By Mr. Carbin) Is that the current
24 address of Brave Cargo Shipping, as far as you know?
25   A   As far as I know, yes.

Page 28

1   Q   Who is Southeast Development?
2   A   Southeast Development is the company that
3 had the yard where the vessel was loading. It was
4 not the owner, but they had to rent it or lease that
5 yard, you know, from, I don't know exactly but they
6 were the operator of the yard where the vessel was
7 loaded and parked.
8   Q   Did Mr. Faskha have insurance on the Tug
9 Billy G?
10   A   No. He try many times and he could not
11 get it. That's why Suncoast get involved.
12   Q   Explain that for me, please.
13   A   Okay. Mr. Faskha -- to get insurance for
14 a vessel, you need two things. The vessel has to be
15 first qualified and inspected by an insurance
16 surveyor, approved by the insurance company. The
17 surveyor has to send a report to the insurance
18 company. And then, secondly, the owner has to show
19 experience in managing vessel.
20      He had none whatsoever. It was the first
21 time he was getting involved in the shipping. So
22 that's why the insurance company knows Suncoast
23 shipping, knows me because I have 14 years of track
24 record, no loss whatsoever, no claim.
25      And the broker, Mr. Frenkel knows me very

Page 29

1 well. He was the underwriter. And he asked me, if
2 you apply as the manager, I'm almost sure that they
3 will give you the insurance.
4   Q   Who at Frenkel?
5   A   Frenkel is the -- explain who Frenkel.
6      You know Frenkel.
7   Q   Yeah, but I need you -- I don't know what
8 you know.
9   A   Okay, okay.
10      MR. SAZANT: He wants to know who you
11 dealt with.
12   A   Okay. Long time ago, maybe 10, 15 years
13 ago he was underwriter for one of my company, Marine
14 Tech Towing and Salvage in Haiti. He was the
15 underwriter to get us the insurance and we had the
16 insurance under him. That's why he knows us.
17   Q   (By Mr. Carbin) "He" who?
18   A   Mr. Frenkel.
19   Q   Mr. --
20   A   John Toscani. John Toscani from Frenkel
21 was the underwriter that provide the insurance for
22 that. And he was my underwriter 10 years ago, 15
23 years ago. I don't remember.
24   Q   When you say "underwriter," do you mean
25 the insurance broker?

8 (Pages 26 - 29)

Page 30

1    A   Yeah.  That's what they call him,
2  "underwriter."
3    Q   So let's go back to the Tug Billy G.  You
4  said Mr. Faskha had no experience with ship owning?
5    A   Zero.  That was his first time --
6  Mr. Faskha was even involved in construction.
7  That's what I understand.  He never had any
8  experience in tug.
9    Q   And where did you learn that an insurance
10  company wants to know that the vessel owner has
11  experience?
12    A   From Mr. Toscani, the underwriter.
13    Q   And when did you learn that?  Was that in
14  connection with the Billy G?
15    A   With the Billy G.  No, no, I learn that a
16  long time.  I knew that because I had insurance from
17  many insurance companies, and the first question
18  they ask you:  What is your experience?
19    As a matter of fact, they ask me to send
20  them a resume of all my experience, which I did,
21  okay.  Travelers asked me that, and I did that.  I
22  have copy of that.
23    Q   Your experience?
24    A   Yes, my experience.
25    Q   Not Mr. Faskha?

Page 31

1    A   No, not Mr. Faskha; my experience.
2  Mr. Faskha, he tried -- that's what I understand --
3  he tried anywhere; that he was not approved because
4  of no experience on the business.
5    Q   So let me understand this.  So Mr. Toscani
6  was trying to get insurance for Mr. Faskha?
7    A   Excuse me?  Mr. --
8    Q   Let's back up.
9    You indicated that Mr. Faskha was trying
10  to get insurance and he could not get it?
11    A   (Nodding.)
12    Q   You have to speak.
13    A   Yes, I understand he could not get
14  insurance.
15    Q   How did you learn that Mr. Faskha couldn't
16  get insurance for the tug --
17    A   Because he told me.
18    Q   -- for the Tug Billy G?
19    A   He told me.
20    Q   Did he tell you who he tried to get
21  insurance with?
22    A   No, he did not tell me who he tried.
23    Q   Did he tell you what broker he was using
24  to try to get insurance with?
25    A   (Nodding.)

Page 32

1    Q   Did he tell you how many companies had
2  been approached --
3    A   No, he never tell me that.
4    Q   Let me finish.  Take a breath.
5    Did Mr. Faskha tell you how many companies
6  he tried to get insurance --
7    A   No, he did not tell me.
8    Q   -- for the Billy G?
9    A   He did not tell me.
10    Q   How did Frenkel get involved, Mr. Toscani,
11  that is, get involved with looking for insurance for
12  the Billy G?
13    A   There you go.  Good question.
14    It just happen that Mr. Toscani was also
15  the underwriter for FLAG 4000.  FLAG 4000 is the
16  company in New York that own the barge FLAG 4000.
17  Okay.
18    And FLAG 4000 was looking because one of
19  the condition that FLAG 4000 told Mr. Faskha, when
20  he approached them to rent -- to lease the barge,
21  "Can you provide insurance for the barge?"  Okay.
22    So Mr. Toscani call me and he told me --
23  and he call Mr. Faskha and he talk to me, and
24  Mr. Toscani talk to you, "We can get you insurance
25  for the barge, too, because we need insurance for

Page 33

1  the barge."
2    So through my company, Suncoast Shipping,
3  they apply for the barge and they apply for the tug.
4  They apply for the barge for $1 million hauling
5  machinery; they apply for the barge for $5
6  million -- I mean $2 million P&I, which is Property
7  and Indemnity, you know.
8    They apply to the company for the
9  coverage.  $2 million, P&I, which is property and
10  indemnity to a third party.  That's what P&I mean.
11  They also apply for hull, H-U-L-L, for the barge, if
12  the barge sunk, whatever happen to it, for $1
13  million.  They apply also for the Billy G, the tug
14  for hull and machinery for $350,000, right.  They
15  apply also for P&I for $2 for Billy G.
16    Q   So if I understand correctly, when Faskha
17  worked out a deal with Flag for the barge, Flag told
18  Faskha that Faskha had to get insurance for the
19  barge?
20    A   Right.
21    Q   And Faskha then made contact, or rather
22  Frenkel, who had a relationship with Flag, went to
23  Faskha and said, "We can help you with this"?
24    A   Yes.
25    Q   And at that point Frenkel was authorized

9 (Pages 30 - 33)

Page 34

1 by Faskha to go look for insurance in the market.
2   A   Yes, of course.
3   Q   And Frenkel couldn't get insurance for the
4 Billy G because of the lack of experience of Faskha.
5 Do I have that right?
6   A   That's it.  You got that right.
7   Q   And then you had a discussion with
8 Mr. Toscani at Frenkel.
9   A   Yes.  Mr. Toscani told me I know you and
10 if you apply, you get the insurance because you have
11 a clean record.
12   Q   So the suggestion was that Suncoast's name
13 be used to get the insurance on the tug instead of
14 the actual owner Faskha?
15   A   Right.
16   Q   And excuse me if I asked you this before,
17 do you know how many companies had been approached
18 for insurance on the Billy G before the application
19 was made to Travelers?
20   A   I don't know for sure, but I'm almost
21 certain that they try a company called -- it's
22 called -- I think there's a company in Miami that
23 they tried, but I don't remember the name exactly,
24 but they did try.  Because he has been trying, even
25 before he met me, he has been trying to get

Page 35

1 insurance for the boat and he could never get it.
2   Q   "He" being Mr. Toscani or Frenkel?
3   A   Yes.  They will never give him insurance,
4 never, because he had no experience.
5       MR. SAZANT:  Who is "he"?  Mr. Faskha or
6 Mr. Toscani?
7       THE WITNESS:  No, Mr. Faskha.  Mr. Toscani
8 only applied to one company, Travelers.
9   Q   (By Mr. Carbin) I see.
10   A   He was approved right away.
11   Q   Excuse me if I asked you this before.
12   A   No, no, you don't have to excuse yourself.
13   Q   What companies did Mr. Faskha apply for
14 insurance for the Billy G?
15   A   I don't know.  I have no idea.
16   Q   Mr. Faskha just told you that he couldn't
17 get insurance because he had no experience.
18   A   Because they wouldn't approve him.  He got
19 no experience as an owner.
20   Q   And was it agreed that the application for
21 insurance for the Billy G would be made using
22 Suncoast's name?
23   A   Yes.
24       (Rouzier Exhibit 9 for identification.)
25   Q   (By Mr. Carbin) Let me show you what we've

Page 36

1 marked as Rouzier 9.  Do you recognize this?
2   A   Okay.  I didn't recognize it because they
3 never sent it to me, but that's what the insurance
4 company was supposed to do.  They did a survey and
5 that's the survey report.
6   Q   Well, if we look at the first paragraph of
7 Exhibit 9 it indicates that the marine surveyor at
8 the request of Mr. Franchini of Flag Container
9 Services, on behalf of Suncoast Shipping" -- no, the
10 first page.  The first page, the first paragraph.  I
11 will go over it again.
12       "That the surveyor is attending, at the
13 request of Mr. Franchini of Flag Container Services,
14 on behalf of Suncoast Shipping."
15       Do you see that?
16   A   Yes.
17   Q   Did you understand that the survey was
18 going to be done?
19   A   Of course.  That's what the -- let me
20 explain something to you very clearly.  It is not me
21 that is responsible to do the survey.  The insurance
22 company before they approve --
23   Q   Let's -- can we -- please, please, stick
24 with my questions and we will get out of here.
25 Okay.

Page 37

1       Do you see in the first paragraph of
2 Exhibit 9, where it states, "The Surveyor is
3 attending at the request of Mr. Franchini of Flag
4 Container Services on behalf of Suncoast Shipping."
5 Do you see that?
6   A   Yes.
7   Q   Is it your understanding that the survey
8 was being performed at the time on behalf of
9 Suncoast.
10   A   Yes, he had the right to do it.
11   Q   Now, turning to Page 4 of the survey,
12 there's an entry "Trip-in-Tow Supplement."  Do you
13 see that?
14   A   Uh-huh.
15   Q   You have to speak and answer, please.
16   A   Yes.
17   Q   And under that entry it reads, "The
18 nominated tug is the Billy G."
19       Do you see that reference?
20   A   Uh-huh.
21   Q   You have to speak and answer, please?
22   A   Yes.
23   Q   And it goes on to say that, "Reportedly
24 owned by Suncoast Shipping."  Do you see that?
25   A   No.  Where is that at?

10 (Pages 34 - 37)

Page 38

1    Q    At the end of that first paragraph on the
2  Trip-in-Tow Supplement. "Billy G reported to own,
3  Suncoast Shipping." Do you see that?
4        MR. SAZANT:  It says "reported."
5    A    "Reported owners Suncoast Shipping," yes,
6  but what that mean? I see it. Who report that to
7  him.
8    Q    (By Mr. Carbin) At the time of the survey,
9  was Suncoast Shipping the owners of the Billy G?
10   A    Never. Suncoast Shipping was never the
11 owner.
12   Q    Are you aware that a copy of this report
13 was given to Travelers --
14   A    Nope.
15   Q    -- for the insurance?
16   A    I'm not aware of nothing. That's the
17 first time I've seen it myself. I've never seen it.
18   Q    If you had seen this stating that Suncoast
19 Shipping was the reported owners of the Billy G,
20 would you have allowed that to go to Travelers?
21   A    I would correct it. That's all.
22   Q    And what would you correct it to say?
23   A    Suncoast Shipping is the managing/owner.
24 Managing/owners. In maritime transportation when
25 this says "managing/owners," that's how they express

Page 39

1  it when you are the manager, otherwise, you increase
2  the owner. You manage for the owner. That's what
3  it is. I was the managing owner, not the owner.
4    Q    Well, you had no ownership interest --
5    A    No, never.
6    Q    Let me finish the question.
7        Suncoast Shipping had no ownership
8  interest in the tug. You were simply acting as the
9  managing consultant?
10   A    Managing owner. That's the deal.
11 Managing owner.
12   Q    But you had no ownership interest?
13   A    No, never.
14        Can I ask you one question, please?
15   Q    We will do it off the record.
16        MR. SAZANT:  Wait until the break. Let's
17   go through the bulk or whatever we have here.
18   Q    (By Mr. Carbin) Do you recall that you
19 telephoned me back in November?
20   A    Excuse me?
21   Q    Do you recall that you telephoned me back
22 in November.
23   A    I probably spoke to you, yes, but I spoke
24 to so many lawyers. I don't recall the date and the
25 name. So many lawyers from Travelers.

Page 40

1    Q    Do you recall that you mentioned that
2  Suncoast Shipping was a marine consultant for Faskha
3  with respect to the Billy G?
4    A    Of course.
5    Q    Is that accurate that you were a marine
6  consultant?
7    A    Yes, I was the management consultant,
8  which I am.
9    Q    Did you ever see the insurance policy that
10 was issued by Travelers?
11   A    Yes, I read it from one end to the other.
12   Q    Let me show you what we will mark as
13 Rouzier 10, which is Exhibit 1 from the complaint in
14 Travelers versus Suncoast.
15        Is this the policy that you read?
16        (Rouzier 10 marked for identification.)
17   A    Yes, everything. Suncoast Shipping is the
18 only loss payee.
19   Q    Is there any mention of Faskha in this
20 policy?
21   A    No, never.
22   Q    Am I correct that in this policy the name
23 of the insured is Suncoast Shipping, Inc. -- I'm
24 sorry, Suncoast Shipping, LLC.
25   A    Yes. Suncoast Shipping, LLC is the

Page 41

1  insured for both, the barge and the tug.
2    Q    Did Suncoast Shipping have a charter for
3  the barge FLAG 4000?
4    A    Yes. I think we mentioned that before.
5    Q    When you reviewed the policy, did you go
6  back to Frenkel and say, "This has to mention
7  Faskha," as having an interest in the tug?
8    A    No. Faskha was out of the question
9  completely because he was not qualified as an owner
10 to have insurance.
11   Q    I see.
12   A    Even though he's the one that pay all the
13 bills. He is the one that send me money and
14 everything.
15        (Rouzier Exhibit 11 marked for
16   identification.)
17   Q    (By Mr. Carbin) Let me show you Exhibit
18 11. Do you recognize that as a copy of the
19 complaint in the lawsuit brought by Travelers
20 against Suncoast.
21   A    Have you read that?
22   Q    Do you --
23   A    Yes.
24   Q    -- recognize that as --
25   A    Yes, I recognize that.

11 (Pages 38 - 41)

Page 42

1   Q   When did you first see this?
2   A   When I received it.
3   Q   I'm sorry?
4   A   When I received it.  When I received it.
5   Q   Going back to Rouzier Exhibit 5, the
6 Plaintiff's Notice of Compliance.  How did you get a
7 copy of that?  Did you get a copy by mail from my
8 office?
9   A   Everything you send to me by mail I got
10 it, so if that is one of them, I got it.
11   Q   And is that also true of Rouzier Exhibit
12 4, the Plaintiff's statement?  Did you receive that
13 by mail as well?
14   A   Was that sent to my address?
15   Q   Yes.
16   A   Do you have a copy of the receipt that it
17 arrive?
18       Everything you send to my address you have
19 copy of it because I only have one address.
20   Q   Right.
21   A   Everything came in.
22   Q   You'll see the last page here is what we
23 call a "service list" of where it was mailed to.
24   A   Right.
25   Q   And it was mailed to two addresses to

Page 43

1 Suncoast Shipping.
2   A   It was mailed to -- let me see.  5475,
3 yes, that's my address.
4       MR. SAZANT:  Let me see that for a second.
5   Q   (By Mr. Carbin) This came from your file.
6 You pulled it out today, so I'm presuming you got
7 it.
8       MR. SAZANT:  I never saw this.
9   Q   (By Mr. Carbin) And similarly you handed
10 us what we've now marked as Rouzier Exhibit 3.  Am I
11 correct you received that?
12   A   Whatever I give you I received it, is what
13 I have in my hand.
14   Q   And you got this --
15   A   I got everything that you send, yes.
16       MR. SAZANT:  I never saw this?
17       THE WITNESS:  I never saw this either.
18       MR. SAZANT:  You never saw this?
19       THE WITNESS:  (Nodding.)  What difference
20 does it make.
21       MR. CARBIN:  All right.  He's referring to
22 what?  Exhibit what?
23       MR. SAZANT:  It says "Plaintiff's
24 Initial."
25       MR. CARBIN:  It's marked as an exhibit.

Page 44

1       What's the number?
2       MR. SAZANT:  Is it 4.
3       MR. CARBIN:  Exhibit 4, yes.
4   Q   (By Mr. Sazant) Did Suncoast Shipping have
5 a Bare Boat Charter for the Flag Container Services
6 barge for FLAG 4000?
7   A   Yes.
8   Q   You pulled out a few other files that --
9 from your bag that you brought today.  May I see
10 them, please?
11   A   No.  The person is on file.  If you ask me
12 a question, I will answer it.
13       MR. SAZANT:  One second.
14       We object because they weren't asked for
15       at any time.
16   A   I only have what you asked me for.  Okay.
17 You send me a letter where you specify exactly what
18 you want, and I'm giving you more than what you're
19 asked for.  Don't abuse me, okay, because that's
20 what you are doing right now.
21   Q   (By Mr. Carbin) Do the files that you have
22 put on the table, do they relate to the -- do they
23 relate to the --
24   A   You're not supposed to ask me that
25 question.

Page 45

1       MR. SAZANT:  Well, you have to answer that
2 question.
3       THE WITNESS:  I did not put nothing on the
4 table.  Okay.  I'm getting sick and tired of
5 that.
6       MR. SAZANT:  Well, no, no.  Just relax.
7 This is -- we have to go through this.
8       THE WITNESS:  Let me tell you --
9       MR. SAZANT:  One second.  Let's take this
10 off the record.
11       MR. CARBIN:  We're not off the record.
12       THE WITNESS:  When they are trying to take
13 you down when you know you're right --
14       MR. SAZANT:  This is procedure.  Standard
15 procedure.
16       THE WITNESS:  Yes, but procedure got
17 limits.  That's why you go to court for,
18 because if there was a judge, the judge would
19 say, "No, you cannot ask me that question."
20 Okay.  You're abusing me.
21       MR. SAZANT:  No, he's not abusing you.
22 He's doing his job as a lawyer.  That's what
23 he's doing.
24       THE WITNESS:  Well, okay.
25   Q   (By Mr. Carbin) The documents that you

12 (Pages 42 - 45)

1 just took off the table and put in your bag, do they
2 all relate to the Billy G?
3    A    No.
4    Q    What do they relate to?
5    A    My personal stuff.
6    Q    Would you look at Exhibit 1, the subpoena.
7        THE WITNESS:  You know that I said you're
8 abusing me.
9        MR. SAZANT:  Jean.  You got to cool it.
10       THE WITNESS:  Everything that I tell you,
11 you have to write it down.  I'm saying that he
12 is abusing me, because what he asked me for, I
13 brought him everything and he wants to go
14 through my personal file right now.  He's
15 abusing me.
16       MR. SAZANT:  Let's take a break for a few
17 minutes here.
18       THE WITNESS:  I'm protesting here.
19       MR. SAZANT:  Let's take a break for a few
20 minutes.
21       MR. CARBIN:  There's a question pending
22 and I would like to get an answer to the
23 question.
24    Q    (By Mr. Carbin) I drew the witness'
25 attention to Exhibit 1, the subpoena.  Would you

1 look at the last page of Exhibit 1, please, sir.
2       MR. SAZANT:  You know what it is.
3    A    Yes.
4    Q    (By Mr. Carbin) Do you see that the last
5 page --
6    A    Each document related to the charter of
7 the Tug Billy G, I can give you one, 10 or 20.  It's
8 what I have.  Okay.  I'm giving you what I have.
9        You cannot ask me for what I don't have.
10 Okay.  Each document related to the tug of Billy G,
11 you ask me for it, I will give it to you.
12    Q    (By Mr. Carbin) Sir, if I may --
13       MR. SAZANT:  That's all he wants.  Give
14 him that.
15    Q    (By Mr. Carbin) That list in the subpoena
16 is the request for the documents.
17       Can you supply the documents that are
18 listed in Schedule A to the subpoena?
19    A    You have everything.
20    Q    I don't have anything.
21    A    Let me give you.
22    Q    What you brought you pulled off the table.
23    A    Let me give it to you.  Let me show you
24 one by one and I will give it to you.
25       MR. SAZANT:  Just one second, Jim.  We

1 sent documents to Ryan by e-mail.
2       MR. CARBIN:  A couple of documents.
3       MR. SAZANT:  That's what I had, yeah.
4       MR. CARBIN:  Let's see.  He indicated he
5 has files of documents in his office.  So I'm
6 asking for those files.
7       MR. SAZANT:  Well, he will get them.
8       They're in your office, right?  They're
9 not here now.  You said you have documents in
10 your office.
11       THE WITNESS:  Let me tell you something.
12 You know what's going to happen, I want it to
13 go to court, because what -- I will have to go
14 and tell the church -- is that through the
15 lawyers, okay, Travelers is a big company.  Is
16 trying to quash a small company like me by
17 lying to the court, by not telling them the
18 truth.  Okay.
19       MR. SAZANT:  That's what we're trying to
20 get to.  That's why you're having your day.
21 That's what we're going to do.
22       THE WITNESS:  I am not going to give you
23 nothing more.  That's the end of it.  Nothing.
24 That's it.  I'm finished.
25       MR. SAZANT:  No, no, it's not finished.

1       Let's take a break for a few minutes.  I
2 think it is important.  Jim, I think it's
3 important to take a few minutes.
4       MR. CARBIN:  Let's take a few minutes.
5       (A recess was taken.)
6    Q    (By Mr. Carbin) Mr. Rouzier, thank you for
7 showing me the file materials that you brought with
8 you today.
9    A    Yes, yes.  There is some I think are good
10 in case you asked for it, you know, I was going to
11 give it to you, whatever you need to answer your
12 question.  They're not in order.  I have to go from
13 a file like that (indicating), you know, and extract
14 what I have.
15    Q    I've taken a look at this and I have a
16 couple of questions on a few of the items.
17    A    Yeah.  I'm very tired and upset.  That's
18 why I am reacting like that.  It's getting to me.
19       MR. SAZANT:  Let's get going.
20       MR. CARBIN:  Let's mark this as the next
21 one.
22       (Rouzier Exhibit 12 marked for
23 identification.)
24    A    Can I say something to you?
25       MR. CARBIN:  We can talk after we're done.

Page 50

1  Let's get this out of the way.
2      MR. SAZANT: Yeah, let's get it out of the
3  way.
4      Q  (By Mr. Carbin) Mr. Rouzier, let me show
5  you Exhibit 12, which is amongst the materials that
6  you showed me. What is that document?
7      A  Yeah. It is the coverage that we had from
8  the insurance company.
9      Q  That's --
10     A  Frenkel is on the right. He send that to
11 me to show me what coverage we have and what premium
12 we have to pay for the cover.
13     Q  Who was shown as the insured on that?
14     A  The insured on that, Suncoast Shipping.
15     Q  Does Safco or Faskha appear anywhere on
16 that?
17     A  No, I don't see that. I don't know.
18     MR. SAZANT: There you go.
19     Q  (By Mr. Carbin) Who is Safco?
20     A  Safco is a corporation -- is a Panama
21 corporation owned by Saul Faskha as the president.
22     Q  So the actual name of the --
23     MR. SAZANT: You have to turn that off.
24     THE WITNESS: I turn it off. Sorry.
25     (Short recess to turn off cell phone.)

Page 51

1      Q  (By Mr. Carbin) Am I correct that the
2  actual owner of the Tug Billy G was the company
3  Safco that was owned by Mr. Faskha?
4      A  Yeah, it have been. And Frenkel knew that
5  from day one.
6      Q  Who are "WRT"?
7      A  Let me see. That is probably -- that is
8  coming from them. You know, they want me to tell
9  them that -- no, no. WRT is the company that is
10 reporting that I never had any loss, any claim.
11     Q  What company is that?
12     A  I have no idea. Probably the broker --
13 the underwriter ask them to send a report on me and
14 they did send a report.
15     (Rouzier Exhibit 13 marked for
16 identification.)
17     Q  (By Mr. Carbin) Let me show you what we
18 have marked as Exhibit 13 and I'd ask you to turn to
19 the second page.
20     Is that your signature on page 2?
21     A  Yes, that's my signature, yes.
22     Q  And is this something that was submitted
23 in order -- as part of the application for the
24 insurance?
25     A  Yes, it was part of the application for

Page 52

1  the insurance, yes.
2      Q  And what this is stating is that Suncoast
3  Shipping has not had any losses in the five years
4  before the application.
5      A  Any losses to it, yes. Any loss history.
6      Q  And then if we turn to the last page of
7  this exhibit, 13, is that your signature there?
8      A  Yes, it's my signature.
9      Q  And that document that you signed begins
10 on page 4 of the exhibit, on the letterhead of
11 Osprey Underwriting Agency," is that right?
12     A  Yeah.
13     Q  Who is Osprey?
14     A  London market. Is the underwriter for
15 London market. That insurance, Travelers is --
16 whenever you ask for insurance, you know, all the
17 insurance sometimes because of the London market --
18 it's probably with the London market.
19     Q  So do I understand that Osprey is a London
20 market insurer for hull and P&I insurance?
21     A  Yeah.
22     Q  Is that a correct understanding?
23     A  Yeah.
24     Q  And you signed this application form for
25 insurance to Osprey; is that right?

Page 53

1      A  Yeah.
2      Q  Do I have that right?
3      A  Yes. Here is my signature.
4      Q  Is this for the Billy G?
5      A  That is for the -- let me see. Oh, that's
6  for the Billy G. Yes, that's for P&I. Property and
7  indemnity, yes.
8      Q  You can hold on to that. We will talk
9  about it.
10     Was this application that you signed part
11 of the submission for insurance for the Billy G?
12     A  Okay. Let me explain to you. It's not --
13 you have two insurance. You have three, as a matter
14 of fact.
15     The first insurance is for hull and
16 machinery. Okay. That's for $350,000. It has
17 nothing to do with P&I. P&I is what we call tow
18 liability, otherwise, if something happens -- if
19 something happen to the barge, that the tow line
20 breaks, you know, or whatever, right, the tug is
21 responsible for the barge.
22     So for that reason, the tug has to provide
23 the barge with what they call the tow liability,
24 which is P&I. That's what it is. For $2 million or
25 whatever the barge is. I don't remember exactly.

14 (Pages 50 - 53)

Page 54

1 So that's the second insurance.
2      The second insurance, it is independent on
3 the first one.  It can be provided by any other
4 company, that's probably what Osprey come into the
5 picture.  Okay.  But it is an insurance that only
6 protect the third party of the barge in case the tug
7 is liable for some kind of damage to the barge or
8 whatever.
9      Q   Was this application assigned on the
10 Osprey letterhead, part of the application for
11 insurance for the Tug Billy G?
12      A   No.
13      Q   No?
14      A   No, it cannot be part of it because it is
15 two different insurance.  One is P&I; one is hull
16 and machinery.
17      Q   Which was the Osprey form signed --
18      A   That is for P&I.
19      Q   Which was the Osprey form signed for?
20 Hull or P&I insurance?
21      A   P&I.
22      Q   Am I correct that Travelers policy
23 included P&I insurance.
24      A   Could be, but it could be also because
25 they attach that to the other insurance and charge

Page 55

1 me for it, because if you see the charge, you know,
2 they attach that -- the broker did, you see.  I had
3 no relationship whatsoever with Travelers.  No
4 relation whatsoever.
5      My relation was with the underwriter.  The
6 underwriter must seek P&I from that company and seek
7 insurance for the other one, but he send me one
8 invoice for everything.
9      Q   When you say the "underwriter" you're
10 talking about Frenkel?
11      A   Yes.
12      Q   So, in other words, you go to Frenkel and
13 they can get hull insurance from one company and P&I
14 insurance from another.
15      A   And whatever.
16      Q   Or they can get them in one package?
17      A   In one package.  It's up to them to do it.
18      Q   Whatever it was, this application that you
19 signed on the Osprey form on Exhibit 13, you signed
20 as part of the application for P&I insurance?
21      A   Yes.
22      Q   Right?
23      A   Yes.  And at all time Frenkel, which is
24 the John Toscani, knew very well that the tug belong
25 to Faskha and I was the manager.

Page 56

1      Q   Did you have a management agreement with
2 Safco, Mr. Faskha, in writing?
3      A   Yeah, we had a --
4      Q   In writing?
5      A   In writing, yes.  We have management in
6 writing.
7      Q   Where is that written management agreement
8 between --
9      A   You didn't ask me for that.
10      Q   Let me finish the question.
11      Where is the written management agreement
12 between Suncoast and Safco, Mr. Fashka's company?
13      A   Where is that?
14      Q   Yes.
15      A   I have it, but not here with me.  I have
16 it in my place.  Yes, I have it.
17      Q   Will you provide us with a copy?
18      A   It was --
19      Q   Will you provide us with a copy?
20      A   Yes, I can send it to you.
21      Q   What does it provide for?
22      A   It's an agreement where I have to help Mr.
23 Faskha to bring the tug to stand up, and I have to
24 help him find cargo for the business.  That's all.
25      Q   And how were you -- how was Suncoast paid

Page 57

1 on that agreement?
2      A   Everything is specified.  For subsale
3 lease it was 2,000.  For R&R it was 3,000.  On the
4 agreement you will see it.  Everything was
5 specified.  Is.
6      Q   Did Suncoast Shipping ever make claim for
7 loss of the Tug Billy G to Travelers?
8      A   Yes.
9      Q   You did?
10      A   Yes, not a claim for -- we did at the end.
11 At the end -- I mean -- okay.  At the beginning, we
12 ask Travelers to -- to bond, to give us bond, a bond
13 for the tug in Cuba.  The answer was, we like to do,
14 but under U.S. law, we cannot send one to Cuba.  So
15 we had to get the license from Washington.  The
16 license is provided to two companies: to Suncoast
17 Shipping and to FLAG 4000.
18      Now based on that license, FLAG 4000 paid
19 for all the expenses, for lawyers, for whatever, to
20 remove this barge from Cuba.  And Mr. Faskha was
21 supposed to pay for all the expenses to remove his
22 stuff.  He did not do it.  Right.
23      What he did instead, he tried to contact
24 some lawyers, you know, in Cuba, meet with some
25 brokers.  I don't know who they are, you know.  And

Page 58

1  they provide money to them because they told him he
2  could negotiate that for a lower fee.  Right.  But
3  he never send officially money.
4      So when the insurance company say, what
5  did you do to remove your tug there?  He send about
6  20 e-mails, right, showing all this correspondence,
7  you know, with Cuba and how much money he spent.  He
8  did spend money.
9      Q   Did you learn that the money spent by Flag
10  to get the barge out of Cuba was reimbursed by
11  Travelers?
12      A   Yes, to Travelers -- to FLAG 4000; not to
13  me.  Not via Suncoast.
14      Q   Right.
15      A   And they were not the insured.  I was the
16  insured, but it doesn't matter at that point.
17      Q   Are you aware that Flag, the owner of the
18  FLAG 4000 was an additional insured on the Travelers
19  policy?  Are you aware of that?
20      A   They were never -- let me tell you
21  something.  The original policy which I have copy
22  of, never mentioned them as second loss payee.  No.
23      When the accident happens, Mr. Jon Toscani
24  send me a letter showing where he is showing
25  Travelers as loss payee also, but it was something

Page 59

1  additional that happened after, not before the
2  incident, so that was a fraud.
3      Q   Are you talking about --
4      A   That was a fraud.
5      Q   Are you talking about the policy that
6  names Flag as an additional insured, that section of
7  the policy?
8      A   Yes.  Let me say something.  I'm reserving
9  my right to take care of --
10      MR. SAZANT:  This is important, Jean.
11      A   Ask me your question again, please.
12      Q   (By Mr. Carbin)  Sure.  Let me show you
13  Rouzier 10, page 56 of 69 at the top, pagination on
14  top I refer to, and it's an endorsement dated
15  February 6, 2013.  Do you see that?
16      A   Can you show that to me with your letter
17  to me.
18      Q   Well, first off, let's stick with the
19  question.
20      A   I don't know where that come from, but I
21  never received it.
22      Q   Let's stick with the question.  Keep that
23  in front of you, please.
24      MR. SAZANT:  What page is that?
25      MR. CARBIN:  Page 56 of 69, looking at the

Page 60

1      pagination on top.
2      Q   (By Mr. Carbin)  Do you see where this adds
3  "Flag Container Services" as an additional insured,
4  a loss payee on the policy?
5      A   Yeah.
6      Q   And that's effective as of February 6,
7  2013, if you look at the date in the lower
8  right-hand corner, right?
9      A   Uh-huh.
10      Q   You have to speak an answer so she can
11  take it down.
12      A   I see that, yes.
13      Q   Now, are you referring to something else
14  that Mr. Toscani sent after the incident in Cuba?
15      A   What I'm saying this is the first time I
16  am seeing that document.  It was never sent to me.
17      Q   What?  This --
18      A   This, with regard to barge FLAG 4000.  I
19  never seen that.
20      Q   This page 56 of 69?
21      A   First time I'm seeing that.
22      Q   And you see it's dated effective as the
23  same day the policy went into effect, February 6,
24  2013, right?
25      A   What I'm saying is that whatever is there

Page 61

1  I never got it.  Okay.  It's new for me.  I've never
2  seen it.  And that will have to be taken care of
3  with Mr. Toscani later on when I sue him.
4      Q   What is it that Mr. Toscani sent to you
5  after the fact?  Do you have that here?
6      A   When I call Mr. Toscani and I told him and
7  I send him an e-mail about the incident, I ask him,
8  because he had never -- you know what they do,
9  brokers, underwriters, sometimes they take two,
10  three months to send the original policy.
11      So I told him, I need it -- because it
12  happened almost immediately after the insured.  He
13  did not send me the policy yet.  When he send me the
14  policy, the original policy never mention FLAG 4000
15  as an additional loss payee.
16      Q   Do you have copy of the policy that he
17  sent to you?
18      A   Yes.  We have many copies here already.
19  You have copies and copies of that.
20      Q   Well, is it different from what we mark --
21      A   It's different from what I see there.  I
22  never see that in my life.
23      Q   Is the copy of the policy different from
24  what we have marked as Rouzier Exhibit 10?
25      A   Yes.

16 (Pages 58 - 61)

Page 62

1    Q   Do you have the policy that Mr. Toscani
2  sent you?
3    A   I can show you copies right there.  You
4  have copy of the -- we have this copies there.
5  Where is the copy --
6        MR. SAZANT:  Well, I don't have it.  I got
7    it from the --
8        THE WITNESS:  Where are copies?
9        MR. SAZANT:  I got it from their exhibits.
10       THE WITNESS:  We never see in these copies
11   any mention about the FLAG 4000 being loss
12   payee.  Never.
13   Q   (By Mr. Carbin) I looked at the materials
14 that you handed me, that you brought with you today.
15 I don't see a copy of the Travelers policy in here.
16     Do have you copy of the Travelers --
17   A   Yes.
18   Q   Let me finish the question.
19     Do you have copy of the Travelers policy
20 somewhere else?
21   A   No.  It's all with my lawyer or here.
22   Q   Let me hand back to you the materials that
23 you showed me.  Can you pull out from there a copy
24 of the Travelers policy that Mr. Toscani sent you?
25       MR. SAZANT:  The actual policy, not the --

Page 63

1        THE WITNESS:  Yeah, yeah, the actual
2  policy.  The actual policy --
3        MR. SAZANT:  Because I got it from their
4  exhibits on the Internet.
5        THE WITNESS:  Yes, you have the actual --
6        MR. SAZANT:  No, but I didn't get it from
7  you.  So if you have a different one, that's
8  what we want to see.
9        THE WITNESS:  Okay.
10       MR. SAZANT:  That's not it.
11       THE WITNESS:  I know.
12   Q   (By Mr. Carbin) Are you referring to this
13 (indicating) as the policy?
14   A   No, no, that's not the policy.  This is an
15 invoice.
16   Q   And I showed Mr. Rouzier Exhibit 12.
17       THE WITNESS:  Have you seen that already?
18       MR. SAZANT:  What is that.
19       THE WITNESS:  You have seen that?
20       MR. SAZANT:  What is that?
21       MR. CARBIN:  I showed it when I went
22   through it.
23       THE WITNESS:  Have you seen that?  Okay.
24   Who is the insured?
25   Q   (By Mr. Carbin) I'm sorry?

Page 64

1    A   Where is the insured?  Do you see FLAG
2  4000 there?
3        MR. CARBIN:  Let's mark this as Exhibit
4    14.
5        MR. SAZANT:  Let me see that.
6        (Rouzier Exhibit 14 marked for
7        identification.)
8    Q   (By Mr. Carbin) We have marked as Exhibit
9  14, the first page of a letter on Travelers
10 letterhead dated June 21, 2013, which the insured
11 pulled from his file and asked "Do you see Flag
12 there."
13   A   He never mentioned.
14   Q   You're looking, sir, for the copy of the
15 policy that Frenkel sent you.
16       MR. SAZANT:  The big -- the bulk.
17       THE WITNESS:  Yes.
18       MR. SAZANT:  That's what he's looking for.
19   A   That's a copy.
20       MR. CARBIN:  The witness has handed me a
21   page, a single page.  We will mark it as 15.
22       (Rouzier Exhibit 15 marked for
23       identification.)
24   Q   (By Mr. Carbin) Do you have anything that
25 goes?

Page 65

1    A   Yes.  All the stuff that concern the
2  insurance.  I don't have that with me here.  You did
3  not ask to bring that to you, so I did not bring it.
4  But I have it.  I have it and the lawyer has it.
5    Q   Would you provide the full copy of the
6  policy that you received from Frenkel?
7    A   Uh-huh.
8    Q   Would you provide the full copy of the
9  policy that you received from Frenkel?
10   A   Yes, I will have -- I will get it to you.
11   Q   So we were talking about whether Suncoast
12 made a claim for the Tug Billy G under the Travelers
13 policy.
14     Did Suncoast file a claim for the loss of
15 the Billy G under the Travelers policy?
16   A   We send a letter.  Is that a claim, asking
17 for payment?  Yes, we did.
18   Q   When did you do that?
19   A   Through my lawyer.
20   Q   Your lawyer being whom?
21       MR. SAZANT:  I sent a letter for them.
22   Q   (By Mr. Carbin) Does Mr. Sazant represent
23 Suncoast Shipping or Safco?
24   A   No, Suncoast Shipping.
25   Q   The letter that Mr. Sazant sent, do you

17 (Pages 62 - 65)

Page 66

1 recall that was after the lawsuit was brought by
2 Travelers?
3      You have to speak.
4      A   It was -- there was two letters.  One
5 before and one after.
6      MR. SAZANT:  It was before.
7      THE WITNESS:  It was before.
8      MR. SAZANT:  I will get them for you.  You
9 want them, I will get them for you, and there's
10 e-mails to Mr. Saunders also.
11      Q   (By Mr. Carbin) Do have you copies here?
12      MR. SAZANT:  Let me just see what I have.
13      MR. CARBIN:  No, no.
14      Q   (By Mr. Carbin) Do you have a copy?
15      A   I don't have copy here with me.
16      Q   Do you have copies in the office?
17      A   Probably in my computer.  You know, I
18 don't print everything I receive.
19      Q   Would you provide us with copies of your
20 files --
21      A   Yes.
22      Q   -- of whatever --
23      A   Because if you did send me any letter, I
24 have it in my computer.
25      Q   Would you provide us with a copy --

Page 67

1      A   Yes.
2      Q   -- from your files?
3      A   Anything that I have, I will --
4      Q   Let me finish.  Let me finish.
5      Would you provide me with a copy of
6 whatever letters that were sent on behalf of
7 Suncoast making a claim for the loss of the Tug
8 Billy G?
9      A   Yes, I will.
10      Q   Now, you're aware Travelers brought a
11 lawsuit against Suncoast, right?
12      A   Yes.
13      Q   Have you hired a lawyer to defend that
14 lawsuit?
15      A   Yes.
16      Q   Who?
17      A   Mr. Sazant.
18      Q   Are you going to enter an appearance and a
19 defense in that lawsuit?
20      A   Yes.  I want to go to court.
21      Q   Do you realize that you're already in
22 default on responding to the complaint?
23      A   Well, my lawyer will have to answer that,
24 because I think we have done whatever the law
25 requests us to do, you know.

Page 68

1      MR. SAZANT:  Just answer.  It's not
2 important.
3      A   Well, I feel that I am not in default of
4 nothing.  As far as I'm concerned, I did what I have
5 to do, right, in function of the letter that I
6 received, you know.  Right.  Okay.
7      And my lawyer did the right thing.  He
8 spoke to you, and you agree on whatever meeting that
9 we have today.  Okay.
10      Q   (By Mr. Carbin) When you got a copy of the
11 complaint that Travelers filed against Suncoast --
12      A   I send them a letter right away.
13      Q   You sent Travelers a letter?
14      A   Yes.
15      Q   Did you ever answer the complaint or hire
16 a lawyer --
17      A   No, no.
18      Q   Let me finish the question.
19      A   I do it myself.
20      Q   Let me finish the question.
21      Did you ever hire a lawyer to answer the
22 complaint?
23      A   No.  After that.
24      Q   Do you have an arrangement with Safco,
25 Mr. Fashka's company about the claim for the Tug

Page 69

1 Billy G, the insurance claim for the Tug Billy G?
2      A   Mr. Faskha had agreed, at the beginning,
3 to pay for all costs, okay, up to $5,000.  Okay.  He
4 spent the first --
5      Q   What costs are you talking about?
6      A   When Suncoast hired a lawyer I told
7 Mr. Faskha, I'm going to defend the case because
8 Suncoast is the one being sued, not you, but you
9 will have to assume the costs.  He said, yes, but no
10 more than $5,000.  He spend the $5,000 and after
11 that he didn't want to spend any more money.  That's
12 it.
13      Q   So if there was a complaint -- strike
14 that.
15      If there was some kind of recovery from
16 the Travelers policy for the Tug Billy G, who would
17 get that money?
18      A   Well, the lawyer, the one spending his
19 time, and he will take whatever belongs to him and
20 give to whatever belong to Suncoast and whatever
21 belong to Faskha.  That is it.
22      Q   How do you figure out what belongs to
23 Suncoast and what belongs to Faskha?
24      A   Faskha owe me a lot of money.  They never
25 paid me.

18 (Pages 66 - 69)

Page 70

1    Q   I'm sorry.
2    A   They owe me money.
3    Q   Faskha owe you money?
4    A   I have the bill I send to them.  They owe
5  me money.  They never pay me.
6    Q   If the claim were paid for the Tug Billy
7  G, Mr. Sazant would get his fees and expenses, and
8  then Suncoast would get the monies owed to it by
9  Faskha?
10   A   Yes.
11   Q   And then the actual proceed would go to
12 Safco?
13   A   Yes.
14   Q   Do you have that agreement in writing
15 somewhere with Faskha?
16   A   Not on that basis, you know, because it is
17 of use that -- you know, I'm a very trust person.
18 I'm not going to receive any money on behalf of
19 Faskha and not give it to them.  You know why?
20 Mr. Faskha and I have excellent relation.
21   Q   You have what?
22   A   Excellent relation.
23   Q   Extended --
24   A   Excellent relation.  It was me and it was
25 him.

Page 71

1    Q   Was there ever a time where the job was to
2  move sand between islands in the Bahamas?
3    A   Yes.  If you want, I can explain that to
4  you.
5    Q   Please.
6    A   Yes.  It was not sand, it was scrap metal.
7    Q   When was that?
8    A   It was before the trip to Haiti when the
9  tug left New York with the barge.  On his way down
10 we were contacted to Mr. Ortega again to go and pick
11 up some 2,000 ton scrap metal at Bimini to take it
12 to Tampa for $100,000.
13       I contacted Mr. Faskha.  He said, yes, I
14 will take that opportunity.  He went to the Bahamas,
15 he met personally with the broker that had the
16 scrap, Mr. Wahn.  W-A-H-N.  They sign agreement for
17 $100,000.  And he was supposed to deposit 10
18 percent.  He only deposited 9,000 instead of 10,000.
19 Mr. Faskha except the money.
20       The tug went and the barge went to Bimini.
21 At that time, remember, we did not have the crane on
22 board yet.  When we get there, we spend three, four
23 days.  Nobody could move the barge.  And when I met
24 owner of the scrap, he said, no, no, no, I don't
25 have a crane to load you.  The crane broke down on

Page 72

1  the port and we have to fix it.
2        We spent three weeks waiting there.  Mr.
3  Faskha, at that time, was in Israel, because he's
4  Jewish.  He was in Israel and I told him what to do.
5  He said give them one more week and see what happen.
6        I give them one more week, nothing happen.
7  Then I have to go and ask for clearance for the tug
8  to leave Bimini and come back to the U.S.  And the
9  barge, nothing was done.  It was like a voyage from
10 Bimini to Tampa.
11   Q   And after that, did the tug come back to
12 Florida?
13   A   Yes, right back to Florida.  The tug have
14 only U.S. paper.
15   Q   When you arranged for the tug to get out
16 of the Bahamas to the U.S., did it go straight to
17 New York?
18   A   No, the tug went right back to -- not to
19 New York, to Fort Pierce.
20   Q   And then up to New York?
21   A   No, it never went to New York.
22   Q   The tug was never in New York?
23   A   The tug, the first time --
24   Q   Was the tug ever in New York?
25   A   Yes, of course.

Page 73

1    Q   I'm sorry?
2    A   Yes, to pick up the barge.  The barge was
3  in New York.  In New Jersey, as a matter of fact.
4    Q   And you brought it down to Florida to
5  load?
6    A   (Nodding).  And instead of coming to Fort
7  Pierce, it went to Bimini to load.  Never get the
8  load, and then came back to Fort Pierce to put the
9  crane on it, on the barge.
10   Q   Did Mr. Faskha's company have some plan in
11 place or arrangement in place to purchase the FLAG
12 4000 barge?
13   A   Yes.
14   Q   What was that?
15   A   He made a lease purchase agreement with
16 FLAG 4000 where he was supposed to pay $32,000 a
17 month, right, until he pays $1 million.  That was
18 the lease purchase agreement.
19       And he give them a personal guaranty on
20 that and he give him $100,000 as security money,
21 what they call recover money.  And just in case the
22 cargo was abandoned somewhere in the Caribbean and
23 never recover that money.
24   Q   Do you have a copy of that agreement
25 between Flag and Faskha?

19 (Pages 70 - 73)

1    A    Yes, we do.  I don't know if I have it
2  with me here, but I do have one.
3    Q    Would you provide a copy of that, please?
4    A    Yes, I will.
5    Q    The agreement.
6    A    Just express to me what you need me to
7  provide you and I will provide you everything that I
8  have.
9    Q    May I?
10    MR. CARBIN:  Counsel, I would like to mark
11  these files that the witness brought?
12    MR. SAZANT:  Go ahead.
13    MR. CARBIN:  Just mark the originals here.
14    MR. SAZANT:  Yeah.
15    (Rouzier Exhibit 16 marked for
16  identification.)
17    Q    (By Mr. Carbin) We've marked as Rouzier
18  Exhibit 16 the materials that Mr. Rouzier brought
19  with him today and showed to us.
20    They're several manila folders and a
21  number of loose pages.  Quite a handful of loose
22  pages, and one, two, three, four, five, six, seven,
23  eight manila folders.
24    The first manila folder is marked in
25  handwriting "Cuba accident report Tug BILLY."

1    The second manila folder is hand marked
2  "Dossiers Cuba/Tug Billy/barge FLAG 4000."
3    The third manila folder is not labeled.
4    The fourth manila folder is labeled
5  "Suncoast documents."
6    The fifth manila folder is labeled, in
7  handwriting, "Personal guaranty of Mr. Faskha to
8  FLAG 4000, Flag -- barge FLAG 4000."
9    There's another unlabeled manila folder.
10  A yellowish manila folder labeled "Joint Venture of
11  Suncoast.  Brave Cargo.  Suncoast Professional
12  Profile."
13    The last manila folder with some
14  handwriting on it, "Joint Container -- Joint Venture
15  Agreement with Brave Cargo Shipping and Suncoast."
16    And as I've said a number of loose pages.
17    (Discussion held off the record.)
18    Q    (By Mr. Carbin) What other records of this
19  whole episode do have you in your office?
20    A    Basically what I have is my agreement with
21  Mr. Faskha, copy of the agreement that Suncoast sign
22  with FLAG 4000 for lease purchase agreement that
23  Mr. Faskha give me personal guaranty for.
24    All the correspondence between FLAG 4000
25  and Suncoast Shipping regarding that venture.  All

1  the certificates, you know, provided by the U.S.
2  Coast Guard and all U.S. Coast Guard inspection
3  regarding the tug, okay, which was approved.
4    When the incident happened, my full
5  report, which you have, you know, right, okay, that
6  I made to the Coast Guard, to Homeland Security, and
7  that way all the way to even the U.S. rep there
8  Cuba.  Okay.  He was involved, you know, trying to
9  help.  The reason he could not help any further is
10  because the tug didn't have U.S. flag.  It had the
11  foreign flag.
12    Q    By the way, when we spoke about a month
13  ago, you mentioned to me that Travelers had done --
14  had been very responsive in terms of trying to
15  get --
16    A    Very responsive.  Let me tell you what
17  happened.  First of all, right away, when I
18  mentioned to Travelers via the brokers, you know,
19  that we had an incident, next day they had lawyer
20  appointed.
21    The lawyer call me and say -- and I have
22  letters to prove it -- that we have been appointed
23  by Travelers, you know, to help Suncoast Shipping,
24  you know.  But they said -- the lawyer contact me
25  and everything and the lawyer said, well,

1  unfortunately we cannot do nothing because we cannot
2  send money to Cuba, according to U.S. law and so on.
3    And then maybe two weeks after that, that
4  same lawyer called me and said they had been fired
5  by Travelers, okay.  And they advise me, as Suncoast
6  Shipping, to get a lawyer.  I found a lawyer, which
7  you can see that, who agree to do you the case on
8  consignment, right, contingency basis, whatever.
9    Okay.  Then one day there was a three-way
10  conversation between Mr. Faskha, Traveler's lawyers,
11  Mr. Toscani, myself, and a guy called Emilo that
12  Mr. Faskha had hired to help him in Cuba.
13    That lawyer when he heard that Mr. Toscani
14  was on the phone he did not like it.  He had told
15  us, we cannot get nobody else involved in the case
16  so he resign from the case right away and he send me
17  a letter, which I have.
18    Q    Who is that attorney?
19    A    I forget the name.
20    Q    Is that Mr. Ward.
21    MR. SAZANT:  I think you have the letter
22  there.
23    MR. CARBIN:  I saw a couple of letters.
24    Q    (By Mr. Carbin) Mr. Massey or Mr. Ward.
25    A    I forget.  I have the letter.  If you need

Page 78

1 it, I can get it to you, but he resign.  At that
2 point, I was left with no lawyer.
3      Q    And it was after that that the license to
4 get the tug and the barge out of Cuba was obtained?
5      A    The license was obtained.  They send me a
6 copy in case I need to send money or Mr. Faskha need
7 to send money.  They said Travelers a copy.
8           Travelers did send money, they pay,
9 probably, I don't know, $18,000, but they get
10 reimbursed more money than what they send anyway.
11           MR. CARBIN:  Let's mark this as 17.
12           (Rouzier Exhibit 17 marked for
13           identification.)
14           THE WITNESS:  Every lawyer I contacted
15           wanted $10,000 before they can even, you know,
16           apply for the case.
17      Q    (By Mr. Carbin) Let me show you what we
18 marked as Exhibit 17, and this appears to be a
19 couple of documents stapled together.
20      A    Yeah, that is FLAG 4000 and Suncoast
21 Shipping.  Flag Container and Suncoast for the barge
22 FLAG 4000.
23      Q    Now there's a personal guaranty at the end
24 of this, the last two pages.
25      A    Yes, given by Mr. Faskha.

Page 79

1      Q    Why is he personally guarantying this?
2      A    Because he's the one that spoke directly
3 to FLAG 4000, convince them to lease purchase the
4 boat.  He called me and said, oh, I've got a
5 fantastic agreement.  I said, what's the agreement?
6 They agree to sell me barge.  He offered them cash
7 for the barge, 600,000.  They said, no, they wanted
8 one million.  Then they agree under lease purchase
9 where he is going to give them $100,000 deposit and
10 $32,000 a month.
11      Q    So is there another purchase agreement
12 that goes --
13      A    No.
14      Q    -- along with this?
15      A    No, not that I know.  They asked me to
16 give guaranty and I said, no, why should I give you
17 a guaranty.  It's not my tug.  It's not my company.
18      Q    So I'm trying to understand how this Bare
19 Boat Charter company comes into play there.
20           Is this part of the lease purchase
21 agreement between Faskha and his company?
22      A    That's correct.
23      Q    And Flag Container Services?
24      A    Yes.
25      Q    Who was paying Flag Container Services to

Page 80

1 hire --
2      A    Mr. Faskha.
3      Q    -- the charter hire --
4      A    Mr. Faskha.
5      Q    -- for the barge under this agreement?
6      A    Mr. Faskha.
7      Q    So even though it says "Suncoast," it was
8 Faskha --
9      A    Faskha.
10      Q    -- that was the charter.
11      A    Yeah.
12      Q    Am I right on that?
13      A    They knew it, that's why they ask him for
14 personal guaranty.
15      Q    Thank you, sir.  Those are all the
16 questions I have.  I reserve the right to resume if
17 we see these documents and some issues pop up.
18           I'm hoping that doesn't happen, but in the
19 event we have to talk again, we will see about that.
20      A    Can I ask you something?
21           MR. SAZANT:  Wait.  I want to ask him a
22      couple of questions.
23           CROSS EXAMINATION
24 BY MR. SAZANT:
25      Q    Mr. Toscani, you mentioned his name.  Did

Page 81

1 you ever speak to him directly?
2      A    Yes.
3      Q    And what is the nature -- what were you
4 speaking to him about?
5      A    I spoke to him to see if he could get
6 insurance under Suncoast Shipping's name for the
7 barge FLAG 4000 and the tug.
8      Q    Now, what did he know about the Tug Billy
9 G?
10      A    He know that the Tug Billy G belong to
11 Faskha Shipping.  And he know I was the
12 manager/operator.
13      Q    Did he ever question that to you?
14      A    No, no, but that's customary.
15      Q    When -- there's a -- I don't know what
16 exhibit this is, but Mr. Toscani, back in
17 January 22, 2013, wrote to -- looks like Osprey.  He
18 wanted some recommendation on you, correct?
19      A    Yes.
20      Q    Was this a recommendation for your company
21 or for you personally or both?
22      A    No.
23           MR. CARBIN:  Objection to form.
24      A    It was both.
25      Q    (By Mr. Sazant) What was the

Veritext Legal Solutions

1 recommendation for?
2     A    The recommendation was to see if on the
3 past years Jean Rouzier, as the manager of the
4 shipping company, has any kind of claim for
5 insurance claims.
6     Q    So you're saying that this is regulated to
7 that?
8     A    Yes.
9         MR. CARBIN: Can we confirm what exhibit
10 you're --
11        MR. SAZANT: That's what I would like you
12 to look at.
13        MR. CARBIN: Is it 13?
14        MR. SAZANT: Yes. Let me see that.
15    Q    (By Mr. Sazant) In looking at this
16 exhibit, I want you to read it carefully.
17        Is there anything there that mentions the
18 Billy G? See if you can find it. I can't, and you
19 can take your time.
20        MR. CARBIN: May I add to that, Counsel?
21        MR. SAZANT: Sure.
22        MR. CARBIN: Is there anything in that
23 exhibit that mentions any vessel?
24        MR. SAZANT: Good question.
25    Q    (By Mr. Sazant) Do you want me to go over

1 it in English, I know it's not your first language
2 -- in French.
3     A    No, there was no Billy G mentioned.
4     Q    Now, you signed a joint venture agreement
5 which is produced -- I don't know what exhibit it's
6 at -- in May 28, 2013, right?
7     A    Yes, with Brave Cargo Shipping.
8     Q    And the purpose of the joint venture was
9 what?
10    A    To joint venture and carry all the cargo
11 they had from Fort Pierce to Haiti.
12    Q    Now, I would like you to read A --
13 Paragraph A of the joint venture.
14    A    "Name. The parties hereby form and
15 establish a joint venture to be conducted under the
16 name of Shipping Cargo to Haiti. The joint
17 venturers agree that the legal title to the joint
18 venture corporate and asset, including the project
19 itself, fully in the name of the joint venture."
20    Q    Thank you.
21        Now, earlier you were showed -- I don't
22 know the exhibit from Meyerrose and Company, January
23 31, 2013. Something to the effect, this was a
24 survey done on a barge, correct?
25    A    Let me see.

1     Q    I'd like you to read -- the first
2 paragraph at the bottom -- which unit is being
3 referred to by this. Is that the tug or the --
4     A    The unit is being --
5     Q    Is that the unit or the barge?
6     A    The barge.
7     Q    So it had nothing to do, you're saying --
8     A    No.
9     Q    Okay.
10        MR. CARBIN: Objection. The document
11 speaks for itself.
12        MR. SAZANT: It does. Okay. Good.
13    Q    (By Mr. Sazant) One other thing. The
14 policy was cancelled, was it not?
15        Was the policy ever cancelled?
16    A    Yes, the policy was cancelled by the
17 underwriters.
18    Q    But who -- was there a return ever of any
19 premium?
20    A    No. They said they was going to return
21 the premium and they never return any premium.
22    Q    No return. You're sure no premium was
23 returned to anybody?
24    A    To anybody. Not to Faskha, not to myself.
25 I don't know if they return it to -- I don't know

1 who.
2         MR. SAZANT: That's it.
3         MR. CARBIN: We're done -- thank you,
4 sir -- for today anyway. Subject to the
5 earlier stipulation.
6         MR. SAZANT: Right.
7         MR. CARBIN: Thank you.
8         (Deposition concluded 2:53 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 86

```
1        CERTIFICATE OF OATH
2
3
4    STATE OF FLORIDA   )
5    COUNTY OF PALM BEACH  )
6
7    I, the undersigned authority, certify that
8    JEAN ROUZIER, personally appeared before me and
9    was duly sworn.
10   WITNESS my hand and official seal this 19th day
11   of January 2015.
12
13
14   _____
15        MARIA E. REEDER, RPR, FPR
          Notary Public, State of Florida
16        My Commission No. EE880783
          Expires: 4/10/2017
17
18
19
20
21
22
23
24
25
```

Page 87

```
1        CERTIFICATE
2
3    STATE OF FLORIDA  )
4    COUNTY OF PALM BEACH )
5
6    I, MARIA E. REEDER, RPR, FPR, do hereby certify
7    that I was authorized to and did
8    stenographically report the foregoing
9    deposition of JEAN ROUZIER; that a review of
10   the transcript was not requested; and that the
11   transcript is a true record of my stenographic
12   notes.
13   I FURTHER CERTIFY that I am not a relative,
14   employee, attorney, or counsel of any of the
15   parties, nor am I a relative or employee of any
16   of the parties' attorney or counsel connected
17   with the action, nor am I financially
18   interested in the action.
19   Dated this 19th day of January 2015.
20
21   _____
22        MARIA E. REEDER, RPR, FPR
          and Notary Public
23
24
25
```